Filed 1/17/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SARAH K.,<br><br>　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SONOMA COUNTY,<br><br>　　　Respondent;<br><br>SONOMA COUNTY HUMAN SERVICES DEPARTMENT. et al.,<br><br>　　　Real Parties in Interest. | A165607<br><br>(Sonoma County<br>Super. Ct. No. DEP5995-03) |

Sarah K. (Mother) petitions this court for extraordinary relief from a dependency court order terminating reunification services and setting a hearing under Welfare and Institutions Code section 366.26 to select a permanent plan for her three-year-old daughter A.G.[1] Mother contends that in view of the fact that she successfully completed her case plan, the trial court erred in finding that returning A.G. to her care would "create a substantial risk of detriment" to A.G.'s "safety, protection, or physical or emotional well-being." (§ 366.22, subd. (a)(1).) Mother argues that the dependency court improperly determined that her September 2021 relapse

---

[1] All statutory references are to the Welfare and Institutions Code. A.G. is now four years old.

1

into substance abuse created a substantial risk of detriment to A.G. She also argues that in finding detriment the dependency court improperly compared A.G.'s current foster home to Mother's home and "evaluated [A.G.'s] best interest, instead of evaluating detriment of return."

We find no error, and therefore we deny Mother's petition.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Jurisdiction and Family Maintenance Services: September 2019 to September 2020*

In September 2019, the Sonoma County Human Services Department (the Department) filed a petition on behalf of then-11-month-old A.G., alleging risk of serious physical harm (§ 300, subd. (a)) and failure to protect (§ 300, subd. (b)(1)). The petition alleged that A.G.'s alleged father, F.G., who had recently been released from prison, violently attacked Mother twice in the baby's presence, once on September 1, and then on September 3. Both incidents involved attempts to choke mother, who struggled to breathe, feared she would lose consciousness, and suffered visible bruising and other injuries. The second incident resulted in F.G.'s arrest on felony charges. At a hearing on September 12, A.G. was detained from F.G. and remained in Mother's home. The court issued a temporary restraining order against F.G.

In a jurisdiction/disposition report filed in October 2019, the Department recommended that A.G. and her 14-year-old half-sister S.K. be declared dependents and remain in Mother's custody with Mother to receive family maintenance services.[2]

---

[2] A separate petition had been filed on behalf of S.K., who, like A.G., lived with Mother. S.K.'s father died when she was an infant; her case is not at issue here.

The Department reported that Mother and F.G. had a history of domestic violence in their relationship. According to a police report from December 2017, F.G., who was on felony probation for domestic violence at the time, head-butted Mother " 'on her nose, causing a visible injury and causing it to bleed heavily.' " Then he shoved mother on the bed and pinched her on her upper chest and right bicep, resulting in visible injuries. At the time, Mother told police that F.G. had assaulted her multiple times previously, pulling her hair, strangling her, and slapping her. Even though F.G. had been violent toward Mother in the past, Mother allowed F.G. to live in the home with A.G., and continued to allow him to live in the home after the September 1 incident, which Mother delayed reporting to law enforcement.

The report summarized Mother's extensive prior child welfare history that dated back to 2015 and involved allegations of general neglect, physical abuse and emotional abuse inflicted by Mother on S.K. (her oldest daughter) and her middle daughter, A.M. Mother lost custody of A.M., in connection with a previous dependency case that involved "intensive voluntary family maintenance" services and "terminated unsuccessfully." A.M. currently resides with her father.

The report also summarized Mother's self-reported history of substance abuse. Mother reported that she tried smoking marijuana when she was nine or 10 years old, tried alcohol at 14, and experimented with ecstasy, cocaine and mushrooms as a teenager. She smoked methamphetamine for the first time in 2015 and continued her addiction for about three years, even though she had been ordered by the court to participate in substance abuse treatment in 2016. Mother said she had been clean from methamphetamine from March 2018 when she learned she was pregnant with A.G., and credited

her sobriety to her pregnancy and being incarcerated, which allowed her to take seriously her participation in a court-ordered program in 2018. The Department reported that it had referred Mother for substance testing on September 5, September 19, and October 10, 2019.

In November 2019, the dependency court adopted the Department's recommended jurisdictional and dispositional findings and orders, found true amended allegations that A.G. was at risk of serious physical harm as a result of F.G.'s violence towards Mother (§ 300, subd. (a)) and that Mother had failed to adequately protect A.G. by allowing F.G. to reside in the home with A.G. despite F.G.'s history of domestic violence, by allowing him to continue to reside in the home after the September 1 incident, and by not promptly reporting the September 1 incident to law enforcement. The court declared A.G. a dependent, continued her placement with Mother, and ordered family maintenance services to Mother. Eventually, a five-year restraining order was granted protecting Mother, A.G., and S.K. from F.G.

Because of Mother's history of substance abuse and treatment, one of her court-ordered case plan objectives was to "provide a safe and sober home environment" and "not be under the influence of any controlled substance that renders her unable to respond to her children's needs." Mother's responsibilities included participating in individual therapy session to address her history of trauma and exposure to violence, participating in a domestic violence program, cooperating with the assigned social worker, substance abuse testing, and participating in a 12-step program.[3]

---

[3] The case plans specifying Mother's family maintenance services are not in the record, but on our own motion we take judicial notice of them, specifically: (1) the document entitled "Case Plan(s)" filed on October 16, 2019, and (2) the "Child Welfare Services Case Plan Update" that is attached

4

In a May 2020 status review report, the Department reported that "[s]ubstance abuse has not been an issue for [Mother] during this review period." Mother reported that she had been off methamphetamines just over two years, used marijuana at night, and occasionally had an alcoholic drink. She also reported that she attended 12-step meetings when she felt she needed to: she told the social worker she would go to a meeting " 'when I have a certain day then I know I will need a meeting and I will go,' " and said, " 'I don't get anything out of a meeting when it's forced.' " At a hearing on May 7, 2020, the court ordered continued family maintenance services and set a further review hearing for October 2020. Mother's updated case plan required her to continue individual counseling, cooperate with the assigned social worker, and make herself available for random drug testing.

B.    *Supplemental Petition and A.G.'s Removal from Mother's Physical Custody: September to October 2020*

On September 9, 2020, about a year after the case had begun, and while Mother was receiving family maintenance services under the supervision of the juvenile court and the Department, a neighbor found Mother unconscious and unresponsive on the grass outside her apartment at around midnight, with 23-month-old A.G. nearby, crying and strapped in her stroller. Law enforcement and paramedics arrived; when mother was finally roused, she became combative and displayed indicators of intoxication including slurred speech and confusion. She admitted taking two "bars" of Xanax, which she later acknowledged had not been prescribed for her. Mother was taken to the hospital and then arrested for child endangerment.

---

to the status report filed on May 7, 2020 but was omitted from the record. (See Evid. Code, §§ 459, 452, subd. (d).)

5

A.G. was taken into protective custody, first to the hospital for examination, and then placed in an emergency foster care home. As a result of this incident, the Department filed a supplemental petition on September 11, 2020, seeking a more restrictive placement (§ 387) alleging that the severity of Mother's substance abuse placed A.G. at risk in her care. In its "Prima Facie [*sic*] in Support of Petition(s)," filed on September 14, the Department stated that the petition was being filed due to "general neglect, suspected parental substance abuse, and caretaker absence" by Mother. The Department reported, "[M]other maintains that what happened was a one-time accident and she was not able to acknowledge the severity of the situation for [A.G.]." The Department expressed "concern[ ] about the many risk factors this family continues to experience, including previous domestic violence, the mother's substance use, and mental health of the mother and [S.K.] despite the services already provided to the family" and on that basis recommended that A.G. remain detained.

At the detention hearing on September 14, Mother acknowledged through counsel that she had taken unprescribed medication, and requested A.G. be returned to her care. Mother's counsel stated Mother was "not unaware of how dangerous this was to her daughter" and she wanted to "reassess and focus on" her sobriety; counsel argued there was "no evidence that this is more than a one-time relapse." The juvenile court ordered that A.G. be detained and remain in emergency foster care. Addressing Mother, the court said, "you left in the middle of the night with your daughter. You passed out from a drug overdose, and just by the grace of God, your daughter wasn't hurt, and you weren't hurt, so without more—the request for return is denied at this time."

6

In a jurisdiction/disposition report filed on October 6, 2020 the Department recommended that the court sustain the allegations in the supplemental petition and order reunification services for Mother. The Department reported that in an interview, Mother said she had obtained two Xanax pills from a friend "months" ago, and took one pill two months before and "one bar with 2 milligrams" on September 9 because she "had such anxiety." With respect to A.G., Mother said, " 'I don't think there is a need for a supervised visit. It is what it is. I would never put her in danger. But I did put her in danger.' "

The Department expressed concern that Mother had used unprescribed medication in light of her history of addiction, that Mother had used the medication when she was feeling stressed instead of reaching out to her support system, and that Mother had used the medication while caring for A.G. The Department also stated that Mother was "open to receiving services to address the issues that have taken her children from her care. These services are to include substance abuse treatment, mental health services, and continuing to address issues of domestic violence. She has been successful when utilizing these services in the past, so the Department has reason to believe she will be again."

At a jurisdiction/disposition hearing held on October 28, the juvenile court found true the allegations of the supplemental petition; adopted the findings and orders submitted by the Department; and scheduled a review hearing for April 2021. Mother's case plan required her to attend and engage in Child and Family Team meetings, engage in weekly individual counseling sessions, cooperate with the assigned social worker, make herself available for random drug testing, participate in a drug treatment program, attend 12-step meetings, and participate in and graduate from Dependency Drug Court.

7

C.    *Six-Month Review and Hearing:  November 2020 to May 2021*

In advance of the six-month review hearing, the Department prepared a Status Review Report recommending that family reunification services be continued to Mother and that the court allow A.G. "to begin a trial home visit . . . when deemed appropriate by all parties."

The Department reported that A.G. was developmentally on track and there were no behavioral concerns at that time.

The Department reported that Mother successfully completed a three-month residential treatment program in southern California on March 9, 2021.  In random drug testing about a week after the program ended, Mother's test results were negative for all substances.  After returning to Sonoma County, Mother was living in a sober living environment, participated in 12-step meetings, had enrolled in an outpatient treatment program, and had maintained contact with the social worker and her supports in southern California to support her recovery.  The Department further reported that the residential program had included treatment to address Mother's mental health issues, and Mother had been referred for individual therapy in Sonoma County to address her past trauma, domestic violence, and grief and loss issues.

The Department reported that Mother had maintained contact and connection with A.G. through virtual visits, scheduled to occur twice a week, and that Mother was in contact with A.G.'s caregiver to monitor her development and well-being.  But by March 16, a week after Mother completed residential treatment, Mother's visits had become inconsistent.  Visits were temporarily suspended after three consecutive missed visits, and were reinstated on March 27.

The Department expressed concern that since leaving the residential program, Mother had obtained prescribed narcotic medication so soon after an abstinence-based program. The Department observed that although Mother had demonstrated willingness to address the issues that led to the dependency and had made some progress in her case plan objectives, concerns remained about Mother's ability to maintain sobriety outside the safety of a residential program, and to create the supportive environment she needed to sustain her progress and recovery. The Department recommended that reunification services be continued to support mother in continuing to "address her past grief and trauma, implement relapse prevention strategies and utilize her service providers and supports to maintain her abstinence from substances and provide both of her daughters with a safe, stable and nurturing environment."

At the review hearing, held in May 2021, the juvenile court adopted the Department's recommended findings, ordered continued services to Mother, and scheduled a 12-month review hearing for October 2021.

D.      *12-Month Review and Hearing: June 2021 to January 2022*

Shortly after the six-month review hearing, A.G., who had been in foster care since September 2020, was placed into a concurrent planning home. About the same time, Mother moved from Sonoma County to Mendocino County.

In advance of the 12-month review hearing, the Department submitted a report recommending that the court terminate reunification services and set a section 366.26 permanency plan hearing. The Department had concerns with Mother's ability to maintain her sobriety.

Mother had enrolled in an outpatient treatment program, first reporting that she found it useful. But in June 2021, she reported she no

longer found the outpatient groups useful.  From April 7 through August 28, 2021, Mother attended two individual appointments (April 7 and May 7), 10 weekly treatment groups, and had eight unexcused absences.

Also in June 2021, Mother admitted that she was abusing her prescription Seroquel by requesting increasing dosages so that she could feel "loaded."  Mother claimed she wanted to get off Seroquel and replace it with marijuana.  She reported using CBD in her tea, and was "adamant" it would not trigger her substance abuse.

Later, the Department caught mother in a lie about her substance abuse treatment.  In August 2021, she told the social worker about a new substance abuse recovery program she had attended (Red Road), providing "details about the benefit of the meeting" and the "significant impact it had on her recovery."  But on further discussion and inquiry, the social worker determined that Mother had not been to the meeting at all, and according to the social worker had gone "into great detail to lie."  Mother then admitted she had lied about attending the meeting.

On or about August 31, 2021, the social worker requested Mother submit to a hair follicle test because of the significant number of random drug tests she had missed.  (She had cancelled tests or not shown up on five dates from June 25 through July 30, and was presumptively positive for THC and negative for other substances for one date in July and five dates in August.)  Only after being requested to give a hair follicle sample did Mother stated that she had "accidentally" used a friend's vape pen that had methamphetamine in it, not suspecting that the vape was other than nicotine.  Three days later, she told the social worker that she had knowingly used methamphetamine on two separate occasions in June 2021.

Mother then admitted herself to an outpatient program (DAAC Perinatal) and in a random test on September 15, 2021, tested positive for THC, noroxycodone, oxycodone, oxymorphone, and methamphetamine. Mother "initially denied any use of methamphetamine." But then she told the social worker that recently she contacted a person whom she had "identified from the onset of this case as a 'negative influence' and someone who is actively abusing substances," and asked this person to meet her, and during the meeting asked the person for some prescription migraine medication that had not been prescribed to her. Mother reported that the "baggie" containing the pills "could have had methamphetamine in it." Mother did not acknowledge the risk she had taken and the poor choice she had made in taking medication that had not been prescribed for her from someone who was actively abusing substances.

Separate from that, A.G.'s older half-sister S.K. reported to the Department that over the weekend of September 17, 2021, when she was visiting Mother, she found a nitrous oxide "whip it" canister lying on the floor under the television. Mother "vehemently denied" any current or recent use, and said this "must have been an old one that fell out of her stuff when she was unpacking." But the Department noted that Mother had reported that sober support peers helped her unpack to ensure that she was not triggered or tempted to use any substance that could have been left in her belongings. S.K., then 16, expressed concern that Mother was being dishonest about her recovery and stability.

The Department acknowledged that Mother had obtained permanent housing in Mendocino County and that Mother was currently participating in the DAAC perinatal program. Mother reported that "she has increased her commitment to recovery and feels supported by her outpatient treatment

11

staff," and also reported that she had a new sponsor and had increased her participation in the 12-step community. Mother had complied with her medical and psychological treatment, and reported that she informed her primary care doctor of her substance abuse history, and that in prescribing narcotic pain medication for her he had prescribed only five pills to guard against abuse.

The Department reported that Mother was visiting with A.G. in a supervised setting twice each week, once in person and once virtually; no concerns were noted. The Department was concerned about Mother's use of substances and the potential harm that A.G. would be exposed to during unsupervised interactions, in light of A.G.'s age—she was then three—and stage of development.[4]

A.G. was reported to have a " 'nervous' itch," described as " 'picking" at her skin when she becomes anxious." Her care providers had reportedly developed strategies to prevent A.G. from scratching her skin until it is red or has abrasions, by reassuring her and using lotion to decrease skin irritation. Apart from that, the department had no behavioral concerns as to A.G.

In its assessment in advance of the 12-month review hearing, the Department offered this evaluation. The Department recounted that A.G.

---

[4] Before the 12-month hearing, which eventually took place in January 2022, A.G.'s foster parents, with whom she was in a concurrent placement, filed two reports with the juvenile court. After A.G. had been living with them for about four months, they reported she was affectionate with them, "loves" her new foster sisters, and "express[es] confusion around her visits and why she needs to do them." About three months later, on January 19, 2022, they reported A.G. had become very attached to their family and had "been having increasingly regressive behavior after her supervised visits w/Bio parent," and "insisting on 'hiding' her face with a blanket during portions of Virtual/Zoom visits, [and] asking to end those visits early."

and her older half-sister first came to its attention due to "witnessing domestic violence in their home and no one protecting them from it" and then subsequently due to Mother taking a prescription drug that was not prescribed for her, resulting in Mother becoming unresponsive and leaving A.G. outside without a caretaker. The Department observed that since before A.G. was born, Mother "battled with addiction," sometimes with success "for periods of time." But from the onset of this dependency case, Mother "fluctuated between demonstrating behaviors indicative of behavior change and periods of inconsistency, poor choices and relapses," and that this "pattern" continued through the most recent review period. The department concluded that Mother had made insufficient progress over the past 12 months in stabilizing her life and demonstrating her ability to 'create and maintain a nurturing, safe and drug-free home environment."

At the contested 12-month review hearing, held on January 24 and 25, 2022, the juvenile court declined to terminate reunification services and instead extended them to the 18-month review period, finding that Mother had "consistently and regularly contacted and visited [A.G.]," "made significant progress in resolving problems that led to [A.G.'s] removal from [her] home," and "demonstrated the capacity and ability both to complete the treatment plan objectives and provide for [A.G.'s] safety, protection, physical and emotional well-being and special needs," and that Mother's "progress . . . toward alleviating or mitigating the causes necessitating placement has been adequate." The court set an 18-month review hearing for March 3, 2022.

E.    *18-Month Review Report: April 2022*

The 18-month review hearing was continued to April 2022. On April 20, in advance of the hearing, the Department submitted a status review report recommending, as it had before the 12-month review, that the court

13

terminate reunification services and set a section 366.26 permanency plan hearing.

The Department reported that Mother continued to reside in independent permanent housing and to report increasing commitment to recovery and sobriety. Mother said that she changed her phone number and deactivated social media to separate herself from people in her past who were not clean and sober. Mother was reported to have consistent attendance at her outpatient program, and regularly tested negative for drugs in random tests from October 29, 2021 through April 4, 2022. But the Department also reported that as recently as November 2021 there was a reasonable suspicion of Mother's abuse of " 'whip its' which are knowingly undetectable in substance use testing."[5] The Department stated that Mother had "demonstrated her ability to establish a lifestyle that does not include illegal drug use," but that the allegations and suspicions concerning Mother's behavior in September 2021, which it had reported previously, the alleged "whip it" use in November, and Mother's admitted relapses, "cast shadows of doubt" on Mother's ability to maintain her sobriety over time and act as "a safe and sober care provider if unsupervised."

Mother regularly visited with A.G., with one in-person and one virtual visit each week. The in-person visits had progressed in February 2022 from supervised to "lightly supervised." The Department stated the visits remained lightly supervised to ensure that Mother was not under the influence of substances. A.G.'s "resistance" to interacting through telephone video chat posed challenges for the virtual visits. During the in-person visits

---

[5] S.K., who had found a canister on the floor of Mother's home in September 2021, apparently also found canisters in a drawer in November 2021.

Mother was consistent and active in engagement; A.G. initiated interactions, games and activities; and A.G. responded in an affectionate and appropriate manner. Mother demonstrated understanding and knowledge of A.G.'s developmental progress; brought toys, games and activities to support A.G.'s development and curiosity; and encouraged A.G. "to try new skills in a supportive and fun way."

The Department reported that A.G. has continued to demonstrate anxious behaviors, specifically compulsive scratching, which decreased as A.G. settled into her current home. The Department stated that A.G.'s previous exposure to emotional abuse, physical neglect and substance misuse in Mother's household put A.G. at "higher risk for social, emotional, and cognitive impairment, adoption of health-risk behaviors, disease, disability, social problems, and early death," and noted "the correlation between an anxious, disrupted, or insecure attachment and her success in future development, social skills and relationships." The Department observed that A.G. had "spent half of her life in the impermanency of foster care placement," and opined that her "need for stable attachment and permanency is critical and urgent."[6]

In its Assessment/Evaluation, the Department wrote that from the beginning of the matter, Mother had "been deceptive about her needs, progress and her ability to ensure the safety of her daughter in her care." In the past few months, Mother demonstrated "that she can make shifts in her thinking and behavior that support stabilizing her mental health and her

---

[6] A.G.'s foster parents submitted a report in advance of the 18-month review hearing, stating that A.G. had been in their care for a year, and was beginning to exhibit "emotional-behavioral struggles," such as yelling and hitting at home.

15

abstinence from substance abuse," and she had "made real progress in her ability to make choices that support a healthy and drug free life." The Department stated that "changes and progress [Mother] has made are worthy of recognition and praise." Yet although Mother's "love and desire to be what [A.G. needs] is undeniable, . . . her ability and timeliness" was in question.

The Department concluded that for most of the time she was receiving family reunification services, Mother engaged in "half measures," and meanwhile A.G. was 'forming attachments in the impermanence of foster care." The Department wrote that "[p]ermanency for [A.G.] is beyond critical," and that although Mother "demonstrated some ability to make the behavior changes necessary to support safety and permanence for [A.G.], she has not been able to demonstrate those changes over time." The Department was "uncertain if [Mother] will maintain that sobriety over an extended time frame, which is what [A.G.] needs and deserves." Therefore, the Department recommended terminating reunification services.

F.     *18-Month Review Hearing:  June and July 2022*

A contested 18-month review hearing eventually took place over three days. During the hearing, the dependency court acknowledged the difficulty of the decision before it.

1.     *Day One—June 6*

On the first day of the hearing the juvenile court heard opening statements from all parties, took judicial notice of the court's file, including the reports submitted by A.G.'s caregivers, and received the Department's 18-month status review report into evidence. The Department did not call witnesses, but reserved the right to call the social worker, Holly Phillips, for rebuttal and for expert testimony.

16

Mother's first witness was social worker Phillips, the author of the 18-month review report. After Phillips' initial direct examination, the Department asked to designate Phillips as an expert, and after voir dire she was designated an expert in "social work and assessment of substance abuse, substance abuse issues."

Phillips testified as to Mother's progress in her case plan. She reported that Mother had attended and participated in child and family team meetings, and was in the process of completing the DAAC outpatient program, where the staff reported Mother had been a consistent and active participant in the program, which was four to five days a week. Mother was regularly participating in 12-step meetings, had found a sponsor, participated in random drug testing at DAAC and for the Department, and participated in individual therapy with a DAAC-recommended therapist. Mother also reported that she had expanded her support network, as she was requested to do. Mother's drug test results had been clean since the September 2021 positive test, except for one presumptive positive for opiates and barbiturates based on a dental procedure.

On cross-examination, Phillips stated that although Mother had been doing well with respect to substance use over the past five to six months, she had concerns about Mother's ability to maintain long-term sobriety based on Mother's extensive history of drug abuse and her history of doing well in structured treatment and then relapsing. Phillips opined that Mother had not demonstrated an ability to stay sober without oversight and structure, in part because of her failure to meaningfully engage in substance abuse services until late in the dependency case. Phillips observed that because Mother's engagement "was so rocky at the beginning of family reunification," she did not have time to complete her current program, where she was doing

17

well, and demonstrate that she could "maintain sobriety with a little bit more independence." Phillips said that to determine whether Mother was likely to maintain her sobriety, it would be important to observe Mother on her own, to see Mother "implement the skills and strategies and coping she learned in the program without this very intense structure." Phillips testified that Mother was "still in a very structured program [with] a lot of reinforcement and oversight," and that Mother had demonstrated difficulty when there was a lack of structure and oversight, as when she had done well in residential treatment and then relapsed. Phillips noted that Mother was reported to be doing very well in the residential program she began in late 2020, but shortly after her discharge there were "questionable behaviors in regard to wanting to smoke weed [and] getting narcotic medication from the dentist," Phillips testified that the credibility of the individual was an issue considered in assessing progress in treating substance abuse, and that she had concerns about Mother's credibility in reporting on her drug use, in particular Mother's dishonesty about her June 2021 relapse, which only came to light after the Department requested a hair follicle test.

As to issues concerning visitation and A.G.'s well-being, on direct examination, Phillips testified that Mother and A.G. had begun having twice weekly in person unsupervised visits about four weeks previously, and that Mother had not missed any visits. She testified that she had observed Mother and A.G. interact, that the interactions were positive, that they appeared to have a loving relationship, and that Mother was affectionate, attentive and engaging during the visits; Mother brought age-appropriate activities and toys to the visits; and A.G. was responsive to Mother. On cross-examination, Phillips testified that there were no reports that A.G. asked to see Mother, and that although A.G. had shown some resistance to virtual

18

visits, she exhibited less resistance to in-person visits. Phillips had no information to suggest that A.G. was upset to leave Mother after visits, and testified that she "transitions with a cheerful demeanor" and "looks for the foster mom." On one occasion, A.G. said, "Mommy here I am" when she approached the foster mother's vehicle in the parking lot after her visit. Asked whether A.G. exhibited any "disregulation" after visits, Phillips responded that "when the visits first started" there had been a recurrence of nervous itching, which had since subsided.

Phillips had been to Mother's home when she first moved in, about a year earlier, and found it appropriate for a child: it was clean and organized, with no observable safety hazards.

On cross-examination, Phillips testified that A.G. was "doing well" in her current placement, where she had been for about a year. A.G. identified the foster family as her family, called the foster mother "Mommy," and participated in family functions and family trips. A.G. had developed relationships with each of the children in the home and with both foster parents, and was affectionate and responsive in her interactions with them. Phillips had observed A.G. "seek out both the foster mother and the foster father when she needs help or kind of when she's feeling a little uncertain."

Phillips testified that before her current placement, A.G. did not have a stable childhood. Some of the instability was the result of domestic violence and substance abuse, and in addition A.G. had "significant disruptions in her attachments from being moved from the care of the mother to the emergency foster home where she also developed a relationship and was very close with them . . . and then once again when we transitioned her to" the current placement. Phillips testified that there was stability in the current placement, where A.G. "lives in a home that is consistent in meeting her

19

needs and it's a very peaceful and nonviolent environment. It's very nurturing and supportive to her age and developmentally appropriate, along with loving." Asked her opinion on whether it would be detrimental to remove A.G. from her current placement, Phillips responded that she believed "it would be detrimental to disrupt her attachment any further."

The Department asked Phillips why stability and permanency were important for a three-year-old like A.G. Phillips stated that it was an "accepted idea . . . that children under five, that's their foundational developmental years." She stated that A.G. "has three years of kind of disruptive and insecure attachment, as well as exposure to significant trauma based on the violence she was in the vicinity of. [¶] So I think of her getting to get a sense of family and belonging in the world is important so she can meet those next stages of developmental markers. [¶] Going to kindergarten; having that kind of stable, nurturing and safe home."

2. *Day Two—June 27*

On the second day of the hearing, the juvenile court received into evidence a letter from Mother's psychiatrist and heard testimony from three witnesses, including Mother.

Mother's first witness on June 27 was her counselor at the DAAC outpatient drug treatment program, who testified that Mother was more than halfway through the treatment program. The counselor testified that mother fully participated in the program, up to five days a week, three hours a day, except when she was excused for visits with A.G. She described the activities Mother engaged in at DAAC, and testified that Mother was subject to random drug testing two to five times per month, and that except when her tests showed substances that were medically excused, such as for an injury or a dental procedure, the tests were clean. The counselor testified that Mother

20

had demonstrated positive behavioral changes, including staying consistently on her medication, which helped her stay motivated and dedicated to her treatment. The counselor explained she could not predict whether Mother would be successful at achieving long-term sobriety, but that Mother had not demonstrated or reported anything that gave her concern for relapse at present and that Mother was "taking all the right steps" and has "done everything that she's been asked to do and then some." On cross-examination by the Department, the counselor testified she was aware that Mother had engaged in court-ordered treatment in the past, but did not know the details of the previous treatments or the details of Mother's history of abuse of prescription drugs.

Mother's next witness was her sponsor in Narcotics Anonymous. She described her expectations of Mother, which are initially calling every day and going to a meeting every day, and then meeting each week to work through the steps, which generally takes about two to three years for someone who shows up every week with their "work" or "writing" done. She and Mother had just started on step three, which she considered good progress. She testified that Mother never canceled, and only once did not have her writing. In addition, Mother checked in with her daily. She found Mother receptive to working the steps, and said that Mother's life was centered around recovery and her children and that Mother had surrounded herself with recovery people. She testified that there was no way to predict whether Mother was likely to relapse, but that as long as she showed up every day and applied the concepts of recovery, as she was doing, she had a good chance of maintaining her sobriety.

Mother testified about her participation in the DAAC program, and described steps she had taken to become and remain clean and sober. She

described her goals of buying a home, providing stability to her children, furthering her education, and having a career in working with women who are victims of domestic violence. She testified that she had a clean and appropriate home where she could care for A.G., and that she was "clean and sober" and "ready to parent."

On cross-examination, Mother admitted that her drug use interfered with her ability to parent because when she was using drugs she was not mentally and emotionally present for her children. Mother testified that S.K. had been out of her care and under a guardianship for four years, from 2015 to 2019 because of her substance abuse.[7] Mother also testified that she lost custody of her middle child in about 2015 as a result of mental health and substance abuse issues. Mother testified that from 2015 to 2019 she was using methamphetamine with A.G.'s father, F.G., and stated, "I had been clean and I had relapsed with [F.G.], yes, and I was on probation at the time."

Mother admitted that drug treatment was part of her initial case plan, instituted when family maintenance services were provided at the beginning of the case in November 2019, and that her failure to comply with that case plan led to A.G.'s removal from her care in September 2020.

Mother admitted that she had relapsed in June and July 2021 and that she had not been forthcoming about relapsing. She admitted being dishonest with the Department about her substance abuse during the course of the case, and testified that she was not forthcoming with the social worker about her substance abuse problems until about September 2021. She denied using methamphetamine in September 2021, and attributed the positive test result

---

[7] At the time of the hearing, S.K., whose case is not before us, was not in Mother's custody. There was a plan for her to have an extended visit with Mother, and a further hearing as to S.K. was scheduled for December 2022.

to the possibility that there might have been methamphetamine in the migraine medicine her friend, a drug user with whom Mother "used to use," had put in a bag for her. She acknowledged that was a dangerous decision and stated that since then she had "completely cut everybody off."

Mother denied using the nitrous oxide "whip its" that S.K. found in her home in late 2021. She testified that she "had a problem with those in the past in recovery and I have not done them this time being clean." As to the containers, Mother testified, "They were in a drawer that were old, all used up. And I should have gone about throwing them away instead of leaving them on my floor."

Mother agreed that she had participated in drug treatment programs in the past and had not been able to maintain her sobriety outside the structure of a program. She acknowledged that in connection with her past attempts at recovery she had claimed "this time is different" but insisted that this time really was different. She believed that things would be different now because she had "never done an outpatient program as intense [as] DAAC." In the past, she "just wasn't doing recovery," but now she was taking her recovery seriously and making changes. Mother testified that she was managing her mental health issues with appropriate prescribed medication and was no longer using marijuana.

After Mother testified, closing arguments began, but were not completed. The hearing was continued to July 7 for the conclusion of closing arguments and the court's ruling.

3. *Day Three—July 7*

At the continued hearing, the court stated that it had read and reviewed supplemental briefing submitted by the parties, and then heard additional closing argument.

In ruling from the bench, the juvenile court identified Mother's accomplishments, noting that "at this time [she] is doing very well. She's working very hard on her case plan objectives." Mother had two or three months left in the DAAC outpatient treatment program; her unsupervised visits with A.G. were going well; she was "attentive, affectionate and engaged"; she was currently testing clean, and had been since entering her current program in September 2021; she had a sponsor; she had found a place to live that was clean, safe, and in a community that allowed her to sever ties from her old life; and she appeared to be "well-intended."

The court found that A.G. had "been through a lot" during her time with Mother, in light of the domestic violence in the home and Mother's use of drugs before and after F.G. was removed from the home. Mother had participated in residential treatment three separate times, in 2016 and 2018 and most recently starting in late 2020 after A.G. was removed from her care, but had not maintained her sobriety, and had continued to use drugs between March 2021 and September 2021. And until September 2021, Mother was not honest or open about the extent of her drug use, as Mother had admitted. In September 2021, when she enrolled in DAAC, Mother "stepped up with full force and effect," but she had been "very late to engage in services." Mother's extensive history of drug use and her dishonesty with the Department about the extent of her drug use was concerning to the court.

The court noted that the proceeding was "long past the 18-month mark," and it had to consider whether, in view of "the past years of extensive drug use and dishonesty and the severe domestic violence in the home, and the fact that [A.G.] was in a place where she's very well bonded, what is in her best interest, and is there a detriment to taking her out of that secure attached placement right now to return to mother." The court observed that

A.G. had been in foster care for almost two years, and would soon be four years old.

The court concluded, "[G]iven the historical issues of drug use and relapse over the course of this dependency case and the fact that this is mom's second dependency case, [and] the significant positive emotional attachment that [A.G. has] to her concurrent foster family, the Court does find it would be detrimental to return her at this time to her mother. [¶] Disruption of the bond with the concurrent foster family would have long-term serious emotional consequences for her."

The court adopted the findings and orders recommended by the Department, and set a section 366.26 hearing for October 27.

Mother timely petitioned for extraordinary relief from the court's ruling, and we granted her request to stay the section 366.26 hearing.

## DISCUSSION

A.    *Applicable Law and Standard of Review*

The purpose of the dependency statutes is to provide for the protection and safety of a minor who comes "under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible." (§ 202, subd. (a).)  "Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty to protect."  (*In re Constance K.* (1998) 61 Cal.App.4th 689, 703 (*Constance K.*).)

Under section 361.5, when a child under the age of three is removed from the physical custody of the child's parent, reunification services are to be provided for six months from the dispositional hearing, but no longer than 12 months from the date the child entered foster care, unless the child is

25

returned to the parent's home.  (§ 361.5, subd. (a)(1)(B).)  However, services may be extended up to 18 months from the date the child was removed from the parent's physical custody, as was the case for A.G.  (See § 361.5, subd. (a)(3)(A) [authorizing extension of services if at the 12-month review hearing the juvenile court finds a substantial probability that the child will be returned to the parent's custody within the extended period].)

At the 18-month review hearing, "the juvenile court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being." (*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 660, citing § 366.22, subd. (a).)  The burden to prove detriment is squarely on the Department.  (*Ibid.*)

In making its determination, the juvenile court is required by statute to "review and consider the social worker's report and recommendations" and to "consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided." (§ 366.22, subd. (a)(1).)  Compliance with a case plan, however, "is not the sole concern before the dependency court judge." (*Constance K.*, *supra*, 61 Cal.App.4th at p. 704.)  Among other things, the court may consider "whether changing custody will be detrimental because severing a positive loving relationship with the foster family will cause serious, long term harm" and "failure of a minor to have lived with the natural parent for long periods of time." (*Id.* at pp. 704-705.)  Detriment need not result from the actions that led to the child's removal from the home:  if return to the home would create a substantial risk of detriment to the child, out-of-home "placement must continue regardless of whether that detriment mirrors the harm which had

26

required the child's removal from parental custody." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 900.)

"We review the juvenile court's finding of detriment for substantial evidence. [Citations.] Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864-865.) In conducting our review, " '[w]e do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 689.) The question before us is whether there is substantial evidence to support the juvenile court's findings, not whether the evidence might support a different conclusion.

B.      *Analysis*

The juvenile court found that returning A.G. to Mother's custody would pose a substantial risk of detriment for two reasons. One was Mother's historical issues of drug use and relapse and the fact that this was her second dependency proceeding. The other was long-term serious emotional consequences to A.G. if her significant positive emotional attachment to her current foster family was broken. In her petition, Mother does not articulate an argument in terms of the substantial evidence standard of review. Instead, she emphasizes her post-September 2021 commitment to sobriety, and the quality of her visits with A.G. To the limited extent that Mother addresses the juvenile court's finding of detriment, Mother's arguments are unpersuasive because they rest on mischaracterizations of the court's findings and ignore or downplay important evidence, including the

27

observational and expert testimony of the social worker.  But "[t]he importance of the social worker's reporting and recommendations in the dependency process cannot be overstated."  (*Casey N. v. County of Orange* (Dec. 23, 2022, G059917) [2022 WL 17881777 at *11].)  The juvenile court "may properly rely upon the agency's expertise for guidance."  (*In re M.C.* (2011) 199 Cal.App.4th 784, 814.)  "At each stage of the dependency proceeding, the social services agency is statutorily mandated to prepare social study reports and make recommendations to assist the court.  [Citation.]  In this role the social services agency acts as an impartial arm of the court in assisting the court to carry out the Juvenile Court Law."  (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 7-8.)  Notably, in her writ petition Mother does not challenge the social worker's qualification as an expert or her testimony.[8]

Apart from arguing that she has complied with her case plan since September 2021 (which Mother concedes is not dispositive), Mother's argument with respect to detriment from drug use rests on her contention that her September 2021 relapse does not create detriment to A.G.  This argument is to no avail, because the trial court did not rest its determination of detriment on a single relapse.

To begin, Mother's own testimony provides evidence of her long-term issues of drug use, including repeated treatment and relapse, and her historical lack of candor about her condition.  Since 2016, Mother had participated in several treatment programs with subsequent relapses.  Mother's drug use led to her losing custody of her middle child in 2015, led to

---

[8] Our dissenting colleague describes the social worker's testimony as "vague, conclusory and speculative," but these are not arguments made or terms used by Mother in her writ petition.

28

a lengthy separation from her oldest child, and resulted in the September 2020 incident where 11-month-old A.G. was left unattended outside in the middle of the night. We do not minimize the importance of Mother's current commitment to sobriety—nor did the juvenile court. But Mother's change of heart came late in the dependency proceeding. Mother failed to participate in substance abuse services as part of family maintenance, and then after engaging in residential treatment from December 2020 to March 2021, relapsed for several months, with the result that she did not commit to sobriety until September 2021. Even after that, though Mother's drug tests were negative, the social worker reported "a reasonable suspicion of [Mother's] use of nitrous oxide 'whip its' which are knowingly undetectable in substance use testing," and which Mother admitted she "had a problem with . . . in the past in recovery." Because of Mother's delay in engaging with substance abuse services, at the time of the 18-month hearing, she was still participating in a highly structured outpatient program, and had not demonstrated the ability to maintain her sobriety without intensive supervision. This was a matter of concern to the social worker, who was qualified as an expert in substance abuse issues. Taken together, all of this constitutes substantial evidence supporting the trial court's finding that Mother's history of drug use and relapse after treatment posed a risk of detriment to A.G.

Mother contends that her case is like *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, where the Court of Appeal held that substantial evidence did not support the juvenile court's finding of detriment. In *Jennifer A.*, children were removed from the custody of their mother when she left them alone in a motel room while she went to work. (*Id.* at p. 1326.) There was no evidence that mother ever physically or emotionally abused the

29

children, or could not provide adequate living conditions, or had any mental illness affecting her parenting skills. (*Ibid.*) In the course of the dependency proceeding, she tested positive for alcohol once, for which she underwent treatment, and she admitted that she occasionally smoked marijuana. (*Id.* at p. 1327.) The juvenile court found detriment based primarily on the mother's missed, diluted and positive drug tests between the 12-month and 18-month review hearings, but the Court of Appeal held that the record did not support a finding that mother's marijuana use created a substantial risk of detriment to the children in view of the fact that there was no evidence that mother had been diagnosed with a substance abuse problem, and no testimony linking mother's marijuana and alcohol use to her parenting judgment or skills. (*Id.* at p. 1346.) Mother's case is different. There is no dispute here that Mother had a substance abuse problem. Mother admitted that when she used drugs, she was not mentally and emotionally present for her children. And her substance abuse led to her losing custody of her middle child and to a four-year guardianship for S.K., as well as the removal of A.G. from her care. She had misled the Department about her drug use, and had participated in treatment programs and failed to maintain her sobriety.

In challenging the trial court's finding that disrupting the bond between A.G. and her current foster family would be detrimental to A.G. because it would have "long-term serious emotional consequences," Mother's only argument is that the juvenile court improperly compared A.G.'s current foster home to Mother's home. But nothing in the record suggests this is what the juvenile court did. There was no dispute that Mother had set up a home that was clean and appropriate for a young child, and no dispute that Mother's interactions with A.G. were loving, appropriate, and attentive. Yet there was substantial evidence in the form of reports from the social worker,

as well as the social worker's observational and expert testimony, to support the trial court's finding of detriment, and this evidence was cited by the juvenile court as it explained its ruling.

A.G. had been out of Mother's care for about half her life: from the time she was just under two to the time she was almost four. She had developed a strong positive bond with her current foster family, with whom she had been living for a year, and she had exhibited behavioral problems, in the form of compulsive itching, when she was separated from her previous foster family, with whom she had also had a strong positive bond. Not yet four years old, A.G. had experienced trauma as an infant from her exposure to domestic violence and experienced two significant disruptions in attachment—her removal from Mother's care in 2020 and then her removal from her first foster family in 2021. The social worker, who was qualified as an expert in social work, testified that stability and permanency were important for a child of A.G.'s age—an opinion on which the trial court relied, and the social worker's report noted a correlation between disrupted attachment and lack of success in development, social skills and relationships. Contrary to Mother's assertion, the trial court's finding was *not* based on a "single statement of the social worker that he [*sic*] believed it would be 'detrimental to disrupt [A.G.'s] attachment [with the caretakers] any further.' "

In closing, we note Mother's unsupported and meritless contention that the Department's agreement to place S.K. on an extended home visit at about the time of the 18-month hearing "shows that detriment does not exist" for A.G. S.K., who was 17 years old and, as Mother observes, "aware of Mother's issues" could be safe in circumstances that are perilous for a three-year-old like A.G. Nor is it appropriate for Mother to suggest that S.K. "would be additional eyes on" A.G. S.K. is Mother's child, not her support person, and

31

S.K. is not responsible for monitoring A.G.'s safety in Mother's care. Mother's characterization of her teenage daughter as an added layer of supervision undermines her position that the juvenile court erred.

## DISPOSITION

The petition for extraordinary writ is denied and the stay of the dependency court's section 366.26. hearing is lifted. Our decision is final as to this court immediately. (Cal. Rules of Court, rules 8.450(a), 8.490(b)(2)(A).)

_____

Miller, J.

I CONCUR:

_____

Richman, J.

A165607, *Sarah K. v. Superior Court*

33

**Dissenting Opinion of Stewart, P.J.**

This dependency case is, sadly, one of the few we see in which a parent with a serious substance abuse problem that led to the removal of her child dedicated herself to recovery to such an extent and with such success that, despite some setbacks, she was clean and sober for a substantial period prior to the end of the reunification period. Unlike in most such cases, here, mother participated fully in services from the outset of the proceedings and, despite relapsing along the way, promptly renewed her commitment to sobriety and succeeded in that effort for at least 10 months. Throughout the proceedings, she consistently visited her child without mishap and demonstrated excellent parenting skills.

At the 12-month review period, even though the relapse had occurred several months earlier, the juvenile court found mother was likely to reunify with her daughter by the time of the 18-month review. Between the 12- and 18-month review periods, mother remained clean and sober, and continued to engage fully in her outpatient treatment program and to live her life in a manner designed to ensure she stayed clean and sober. Notwithstanding mother's continued success, at the 18-month review hearing the court declined to return her child to her custody, terminated her reunification services and set the case for a permanency hearing under section 366.26. It found that returning the child to mother would pose a substantial danger to the child for two reasons: first, mother's history of drug addiction and prior relapses left it uncertain she would not relapse again, and second, her child had bonded with the foster family with whom she had lived for about a year, and removing her from that family would cause her to experience serious, long-term emotional damage. The court based both concerns on the testimony of a social worker whose opinions were vague, conclusory and

1

speculative. Because there is no substantial evidence in this record that her child would be at substantial risk in mother's custody, I would grant mother's petition for a writ of mandate.

## ANALYSIS

Until reunification services are terminated, family preservation is the legislatively mandated goal of our dependency scheme. (*Georgeanne G. v. Superior Court of Los Angeles County* (2020) 53 Cal.App.5th 856, 870 (*Georgeanne G.*); *In re C.W.* (2019) 33 Cal.App.5th 835, 839.) " '[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency.' " (*In re Zacharia D.* (1993) 6 Cal.4th 435, 447, quoting *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 (*Marilyn H.*).) "This could be for a period as long as 18 months." (*Marilyn H.*, at p. 310.) "The parent is given a reasonable period of time to reunify and, *if unsuccessful*, the child's interest in permanency and stability takes priority." (*Marilyn H.*, at p. 309, italics added.) It is only after reunifications services have been terminated that "the focus shifts to the needs of the child for permanency and stability." (*Ibid.*; accord, *In re Jasmon O.* (1994) 8 Cal.4th 398, 420 (*Jasmon O.*).)

Given the importance of family preservation, only if a parent poses a "substantial risk of detriment" to a child's safety, protection or physical or emotional welfare may the state continue to deprive the parent of physical custody of their child during the reunification period (§ 366.22, subd. (a)(1)) and thereby subordinate the constitutionally protected interests in a child's care and companionship that parenthood otherwise entails. (See *Jasmon O.*, *supra*, 8 Cal.4th at p. 419; *Marilyn H.*, *supra*, 5 Cal.4th at p. 307). Put simply, the parent must pose a "substantial" danger to the child in some way.

2

In evaluating this issue, " 'the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement.' " (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.) "The evidence must be viewed in light of the . . . parent's response to services and demonstrated ability to safely care for the child," despite the dangers the parent initially posed to the child. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425.)

The burden to show substantial danger is on the agency (§ 366.22, subd. (a)(1)), and it is a high one. (*Georgeanne G.*, *supra*, 53 Cal.App.5th at p. 864.) "[T]he risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) It does not require perfection, including in compliance with services. (See *ibid.*; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789–790; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343.) "[T]here are times when we have to take a step back and make sure that we are not losing sight of our mandate. We are looking for passing grades here, not straight A's." (*David B.,* at p. 790.) Nor in my view, in a case involving substance abuse, does it require certainty that a parent will never again relapse; the nature of addiction, after all, is that relapse is an ever-present, lifelong risk, which is why addicts in recovery consider sobriety to be a lifelong project. In this case there was uncontradicted testimony to that effect by three witnesses: mother's substance abuse treatment counselor, her narcotics anonymous sponsor and the Department's social worker.

In affirming the juvenile court's finding of substantial risk of detriment, the majority engages in a cramped reading of mother's brief.

Although not a model of artful advocacy, the brief squarely asserts that mother had ameliorated the danger that led to her child's removal by the time of the 18-month review hearing. The Department responds to that contention. With interests at stake as weighty as the loss of a child, "[i]t is our role to review the arguments [appellant] has attempted to make and evaluate them to the best of our ability based on the record before us." (*Conservatorship of Ribal* (2019) 31 Cal.App.5th 519, 523.)

Beyond that, the majority commits three basic legal errors. In evaluating the record, it relies upon isolated aspects of mother's conduct during the reunification phase but fails to consider the entire evidentiary record as a whole, in contravention of settled principles of substantial evidence review. It also misconstrues, and thereby substantially weakens, the "substantial detriment" standard. And it credits as substantial evidence on several key points opinions of the Department's social worker that are nebulous and speculative and do not constitute substantial evidence.

I agree with the majority that in reviewing the juvenile court's detriment finding for substantial evidence, we must resolve all factual conflicts in favor of the court's findings, cannot reweigh the evidence and cannot exercise our own independent judgment as if we were deciding the issue anew. Nevertheless, the substantial evidence standard, although deferential, "is not toothless." (*In re I.C.* (2018) 4 Cal.5th 869, 892 (*I.C.*).) It does not mean "any" evidence. (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 423.) "It is well settled that the standard is not satisfied simply by pointing to " ' "isolated evidence torn from the context of the whole record." ' " (*I.C.*, at p. 892; accord, *People v. Johnson* (1980) 26 Cal.3d 557, 577 [" 'it is not enough for the respondent simply to point to 'some' evidence supporting the finding, for "Not every surface conflict of evidence remains

4

substantial in the light of other facts" ' "].)  Rather, substantial evidence "is ' "substantial" proof of the essentials which the law requires.'  [Citations.]  The focus is on the quality, rather than the quantity, of the evidence.  'Very little solid evidence may be "substantial," while a lot of extremely weak evidence might be "insubstantial." '  [Citation.]  Inferences may constitute substantial evidence, but they must be the product of logic and reason."  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

"Speculation or conjecture alone is not substantial evidence.  [Citations.]  Expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record.  Opinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.'  [Citation.]  [¶] The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  (*Roddenberry v. Roddenberry*, *supra,* 44 Cal.App.4th at pp. 651–652.)  " 'The Court of Appeal "was not created . . . merely to echo the determinations of the trial court.  A decision supported by a mere scintilla of evidence need not be affirmed on review." ' "  (*Id.* at p. 652.)  In the dependency context, moreover, "[p]erceptions of risk, rather than actual evidence of risk, do not suffice as substantial evidence."  (*In re G.Z.* (2022) 85 Cal.App.5th 857, 883.)  Nor is the detriment standard satisfied by an agency's "vague and nebulous concerns that [are] not supported by evidence."  (*M.G. v. Superior Court of Orange County* (2020) 46 Cal.App.5th 646, 662.)  Although social workers play a vital role in our dependency scheme, not every opinion of a child welfare worker rises to the level of substantial evidence.  (See, e.g., *I.C.*, *supra,* 4 Cal.5th at p. 894 [opinion of social worker qualified as expert in child abuse risk assessment was not substantial evidence of child's truthfulness].)  The majority fails to heed these principles.

5

A key factor in assessing the danger a parent poses to her child is the extent of the parent's engagement in reunification services. (*E.D.*, *supra*, 217 Cal.App.4th at p. 966). I disagree with the majority's assertion that mother "delay[ed] in engaging with substance abuse services." (Maj. at p. 29.) The trial court's finding to that effect is not supported by substantial evidence. During the one-year period of family maintenance that preceded A.G.'s removal, the substance abuse component of mother's family maintenance services did not include any substance abuse rehabilitation program.[1] Nonetheless, mother participated in the services that were offered and maintained her sobriety for nearly a year, until she was discovered in the condition that led to her child's removal.

Once the court ordered reunification services, mother took advantage of all services offered to her, including substance abuse treatment. During the early portion of the 12-month review period, after having completed a three-month residential treatment program, she relapsed, which is when for a few months she stopped drug testing and regularly attending her outpatient program. However, prior to the relapse she *had been* engaging in her services. And after she relapsed, she re-committed herself to engaging in services. She admitted herself into a more rigorous, year-long outpatient substance abuse program, which she drove many hours from home to attend, five days a week for three hours a day. Four months *later*, the court extended her reunification services a second time at the 12-month review hearing and made specific factual findings expressing confidence in her capacity for

_____

[1] During the first six months, it entailed random drug testing, participation in a 12-step program and therapy. During the second six months, it involved only random drug testing and therapy.

6

positive change.[2] The fact that mother fell off the wagon after completing her residential treatment was a set-back. It did briefly impede her recovery efforts.[3] But it is not evidence that she was late to engage in services. It is evidence only that the services in which she had engaged earlier in the reunification phase had not been fully effective in helping her maintain sobriety.

This brings us to mother's continued progress toward eliminating the condition that led to A.G.'s removal (see *E.D.*, *supra*, 217 Cal.App.4th at p. 966), which was considerable. By the time of the 18-month review hearing, the juvenile court found that mother had been clean and sober for at least ten months and had been visiting A.G. regularly and that "the visits have been going well for the last year." It found mother was doing very well in and had nearly completed her "stringent" year-long substance abuse treatment program, was working with a demanding 12-step sponsor, was "on a good track," had made many positive behavioral changes including severing all ties from her prior substance abusing life, and was a "good" and "well-intended person."

---

[2] At the 12-month review hearing in January 2022, the court found mother had "consistently and regularly contacted and visited [A.G.]," "made significant progress in resolving problems that led to [A.G.'s] removal from [her] home," and "demonstrated the capacity and ability both to complete the treatment plan objectives and provide for [A.G.'s] safety, protection, physical and emotional well-being and special needs." It found she had made adequate "progress . . . toward alleviating or mitigating the causes necessitating placement" and "[t]here is a substantial probability that, with the continuation of services to [mother], [A.G.] will be safely returned [to] [mother's] physical custody during the extended service period."

[3] The court found that during that period, mother was "not front and center with digging into the services and communicating with the Department like you are now."

7

The majority largely fails to take account of the evidence of these positive changes, which was formidable. Not only were there ten months of clean drug tests by that juncture, but also:

(1) The Department acknowledged mother had "demonstrated her ability to establish a lifestyle that does not include illegal drug use." The social worker who testified for the Department also reported that mother was presently doing "really well," had exemplified her progress by addressing with her dentist the pain medication necessary for a dental procedure in a proactive, open and responsible way, and had been implementing the skills she had learned in her new program, including talking with her sponsor, using her support group, and making progress in being transparent with the Department.

The social worker also acknowledged that addicts in recovery consider recovery to be a lifelong process and considered it positive for someone in recovery to seek support and services for the rest of her life. She also acknowledged that relapses happen and that some people "come back and do better" after relapsing.

(2) Mother had become an exemplary student in her year-long outpatient substance abuse treatment program and had nearly completed it. The program's director had seen "a 'real shift' in [mother] over the past few months," described her as a "role model" for her peers and reported she was co-leading a treatment group as part of her senior responsibilities in the program. Her substance abuse treatment counselor testified that mother, on her own initiative without prompting, had been meeting and exceeding all program requirements and was "on the right track for long-term sobriety." And the court found it was a "good" program with "stringent requirements" that mother had nearly completed.

(3) Mother had become a stellar participant in her Narcotics Anonymous 12-step program. Her sponsor testified she was an "A plus" student who called every morning to check in, was very receptive to working the steps of the program, was open to feedback without defensiveness and "just continues to show up with integrity and perseverance and honesty."

(4) Mother had become active in the wider clean and sober community. She was serving as the "speaker seeker" for her local Narcotics Anonymous support group, requiring her to travel outside the county to meet with other addict recovery support groups and to recruit speakers to talk at her group's meetings. Her sponsor testified this role enabled mother to go beyond her own comfort zone and helped her broaden her own and her group's clean and sober network. Mother had never done something like this when attempting to get clean in the past.

(5) Mother had openly discussed her drug addiction history with her doctors so they could help her limit her access to narcotics.

(6) She had gained valuable insight that her bipolar disorder was incurable and a contributing factor in her prior relapses, had found new and better medication to manage that condition and had devised a regular weekly regime to ensure she never again missed her medication.

(7) Mother had cut off all ties with people from her drug-abusing past by moving to an entirely new community, getting off social media, changing her telephone number and purging her phone of all of their contacts. These efforts made mother stand out to her 12-step sponsor in ways she rarely had seen.

(8) Mother's substance abuse counselor and 12-step sponsor both testified she was doing all she needed to do to be on track for long-term

9

sobriety. Neither perceived her to be at any current risk of risk of relapsing, and their testimony was unrebutted.

(9) Finally, mother testified about the pivotal moment when she decided to be honest with herself and everyone else about her addiction and her entirely changed attitude and commitment to sobriety. In substance, she testified that when she relapsed during the twelve-month review period, it felt "terrible" because she had already made so much progress, and it caused her to realize she had to summon the courage to be honest about having slipped back into drug use or she would never get the help she truly needed. She testified she didn't want to continue her patterns of lying and using drugs, and wanted to stay clean, and also be a good parent who was present for her children. "I started methamphetamine when I was 35 and I am 41 now and I am exhausted already," she testified. "I don't want to live that [way] anymore." She testified about her new-found self-respect and stronger boundaries with people who could put her sobriety at risk, and that she was now prioritizing herself, her kids and her recovery as her "number one goal." "I am being sel[f]ish in my recovery," she testified, "[i]t's about me and my kids." She also had learned the importance of reaching out to her sobriety support network for help when she hit bumps in her recovery rather than rely solely on herself, because she had learned she couldn't achieve sobriety all on her own.

The majority's analysis discusses none of this evidence or context. Instead, it focuses on the isolated facts that mother was a recovering drug addict who had received drug treatment in the past, fell off the wagon earlier during the reunification phase and lied to cover it up. That is not the way to conduct substantial evidence review. (See *I.C.*, *supra*, 4 Cal.5th at p. 892.)

10

The principle that we do not require perfection from a parent in benefiting from reunification services in order to safely return their child applies equally to parents battling drug addiction. The juvenile court was not required to ignore mother's relapse episode, but not all relapses "are created equal." (See *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505.) It was significant if "viewed as a likely first step in [mother's] backslide" into chronic drug use (*id*. at p. 506), but that was not what happened. Instead, mother redoubled her efforts and achieved sobriety for at least ten months. She did so not within the restrictive confines of a residential treatment facility but while living independently in her own home, with unfettered access to opportunities for temptation. "[W]e cannot overstate how difficult it must be for an addict to abstain from drugs without help." (*In re E.T*. (2018) 31 Cal.App.5th 68, 78.) Even with the help mother wisely sought and received, the changes she made that enabled her to achieve and sustain sobriety were no small feats. (See *id*. at pp. 73–75, 78.) Simply put, it is hard to imagine what more mother could have done to fulfill the court's prediction at the 12-month review hearing about her prospects for success or to inspire greater confidence in her capacity to achieve long term sobriety.[4]

The social worker's testimony, in substance, was not that there *is* a substantial risk that mother will relapse, but that, because mother had not yet quite completed her rigorous outpatient treatment and put all her newly

---

[4] The majority also notes mother's "historical lack of candor" about her drug use and that she lost custody of another child due to her addiction. Neither fact adds anything to the detriment question. Both go hand-in-hand with mother's struggle with addiction, which was the reason for A.G.'s removal. The question is whether mother could safely parent *this* child by the time of the 18-month review hearing, despite the danger her drug use once posed to this child.

acquired skills to the test outside the structure of that program, there was insufficient information to assess the likelihood of her relapsing again. Yet she could not quantify how much more time would be enough. Nor did she identify any further steps mother needed to take to support her long-term abstinence beyond those she had already taken. Her opinion about mother's potential danger to A.G. failed to credit mother's overall progress, which was "contrary to the entire purpose of the dependency scheme." (*M.G.*, *supra*, 45 Cal.App.5th at p. 663.) The social worker's *uncertainty* is not substantial evidence that A.G. would presently be at significant risk in mother's custody. (See *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 791–792.) Nor is her speculative fear of another relapse or desire for more time to see mother prove her commitment to sobriety. Although well-intentioned, the social worker improperly shifted the burden of proof to mother. Other courts have held that social worker opinions were not substantial evidence of detriment for similar reasons, and so should we. (See *M.G.*, *supra*, 46 Cal.App.5th at p. 663; *Georgeanne G., supra,* 53 Cal.App.5th at p. 869; *In re Heather P.* (1988) 203 Cal.App.3d 1214, 1227, disapproved on another ground in *In re Richard S.* (1991) 54 Cal.3d 857, 866, fn. 5; *Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1401; *David B.*, at pp. 791–792.)

No crystal ball can predict with any certainty the path of a substance abuser's recovery. As every witness acknowledged, there is never a guarantee that a narcotics addict will not relapse—no matter how many years of sobriety go by. But the fact that that there is always some risk of relapse or that mother had previously relapsed after attending other programs are not evidence she posed a "[s]ubstantial" risk of detriment to A.G. under the circumstances extant at the time of the 18-month review hearing. (§ 366.22, subd. (a).) Absent competent expert opinion by someone

12

who had evaluated mother and opined that, given the details of her past history and her current psychological makeup, she was likely to relapse again, there was simply no evidentiary basis to conclude at present that she was. Nor was there any evidentiary basis to conclude that even if she *were* to relapse back into drug use, she would lack the capacity or resources to protect A.G. from harm, after all the progress she'd made to build new support networks and learned to stop trying to handle life's difficulties all by herself.[5]

In upholding the juvenile court's finding of substantial detriment, the majority overlooks how high that standard is, with troubling implications that are at odds with the entire point of providing reunification services and the principles underlying our dependency scheme. It essentially holds that any risk of parental drug relapse, however uncertain, will justify a child's continued removal from parental custody. It thereby relegates virtually all parents with a serious history of drug addiction to the permanent loss of their child no matter how much progress the parent demonstrates toward achieving sobriety during the reunification period. If the Legislature had intended that result, then one could reasonably question why it provided for reunification services to be offered at all in substance abuse cases. But it did. Not surprisingly then, other courts have come to understand relapse is a normal part of recovery" and "a relapsed parent is far from hopeless." (*In re B.E.* (2020) 46 Cal.App.5th 932, 941). "It is decidedly *not* fruitless to offer

---

[5] Mother is aware, and openly acknowledged at the hearing, that her substance abuse interfered with her ability to be a good parent in the past. The majority tacitly holds that testimony against her, as a reason to uphold the court's detriment finding. I view it as an important insight and a testament to the progress she has made in her attitude toward drugs generally and the importance of recovery to being a good parent.

services to a parent who genuinely made an effort to achieve sobriety but slipped up on the road to recovery." (*Ibid*.)

Here, mother turned her life around and achieved sobriety for a substantial period, and there was no indication she was at any *current* risk of relapsing. "Substantial" risk doesn't mean any risk. In upholding a finding of substantial detriment on this record based on mother's past drug use and relapse during an earlier phase of reunification, the majority fails to acknowledge the nature of addiction. It turns the goal of family preservation into an empty promise for parents making a concerted, genuine effort to battle serious drug addiction. (Cf. *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 713, fn. 1 (*Constance K.*) ["To allow children to be permanently removed from their home due to the possibility that their mother, though currently sober and in full compliance with the case plan, might return to drug use would turn the statutory scheme into a farce"] (dis. opn. of Armstrong, J.).) Any remaining concerns about mother's dedication to sobriety could be addressed through a safety plan and the provision of family maintenance services, an issue mother raises but the majority does not discuss. (See *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 312; *Georgeanne G., supra,* 53 Cal.App.5th at p. 867; *Yvonne W., supra,* 165 Cal.App.4th at p. 1402.) Indeed, the statutory scheme expressly contemplates that, in appropriate cases, children may safely be returned to parents who are enrolled in a *residential* treatment program. (See § 366.22, subd. (a)(1).) This indicates the Legislature did not intend that, to safely care for a child, a parent must necessarily be leading a clean and sober lifestyle without the benefit of support services. As mother and the other witnesses in this case recognized, recovery is a life-long project. It "takes a village" (to borrow a phrase), not a deserted mountaintop.

14

This brings us, finally, to the issue of A.G.'s emotional well-being. The Supreme Court has said, "[T]he existence of a successful relationship between a foster child and foster parent cannot be the sole basis for terminating parental rights or depriving the natural parent of custody in a dependency proceeding." (*In re Jasmon O., supra,* 8 Cal.4th at p. 418.) Here that is all the evidence shows. The juvenile court's finding that A.G. would suffer long-term, serious emotional damage if returned to mother is not supported by substantial evidence.

First, to the extent the court meant that it be would emotionally damaging simply to move A.G. again from one home to another, that is not enough. That kind of disruption is inherent in the very concept of returning a child to parental custody. Were that the legal standard of substantial emotional detriment, our dependency scheme would come to a grinding halt.

Second, to the extent the court meant that the loss of A.G.'s familial, loving bond with her foster family would cause her to experience long-term serious emotional damage, the evidence is insufficient. Unlike in *Jasmon O.,* where the Supreme Court held the evidence rose to that level, there is no evidence here that A.G. has a history of any mental health issues. There was no diagnosis of such issues by a competent mental health professional and no evidence that A.G. received any mental health treatment. Nor, unlike *Jasmon O.,* was there any question about mother's capacity to be a nurturing, empathetic parent to her. (Cf. *Jasmon O.*, at p. 426 ["detriment to [the child] in returning to her father's care would arise not only because of the disruption of her bond with the foster parents but also because of the father's unfitness to meet her extraordinary needs"]; see also *id.* at pp. 416–417 [evidence from mental health professionals "overwhelmingly" demonstrated that transitioning child to father "caused her to develop a mental illness"].)

15

The most that can be said here is that A.G. exhibited some nervous scratching when she changed foster care placements, which resolved over time and was not regarded as a serious issue, and that when visits transitioned from virtual to in person, she initially exhibited some emotional dysregulation but no such behaviors were reported during the final review period. Around the time of the 18-month hearing, her foster family also reported she had begun sometimes "yelling and hitting" at home which, as many parents of young children could attest, is classic toddler tantrum behavior. The Department never recommended any mental health interventions for A.G.; on the contrary, it affirmatively reported during the first two review periods that none were needed. She had lived with mother for the first two years of her life, visited regularly with mother during the case, was nearly four years old by the time of the 18-month review hearing and had lived in her current foster home for only a year. The social worker acknowledged she had a loving relationship with mother and, apart from the temporary challenges posed by virtual visitation, never exhibited any resistance to the visits but, on the contrary, was cheerful when they concluded. I thus agree with the majority that there is "no dispute that Mother's interactions with A.G. were loving, appropriate and attentive." (Maj. at p. 30.) In *In re Rodrigo S.* (1990) 225 Cal.App.3d 1179, cited favorably by the Supreme Court (see *Jasmon O.*, *supra*, 8 Cal.4th at p. 418), the appellate court held a juvenile court had erred in finding that returning a young child to his father's custody would be detrimental in similar circumstances. (See *Rodrigo S.*, at p. 1182; see also, e.g., *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 507.) The same is true here.

The only possible basis upon which to uphold the juvenile court's finding of long-term, serious emotional harm is, once again, the opinion of the

16

Department's social worker, which the majority alludes to. The social worker did not testify that A.G. was at risk of suffering significant, long-term emotional damage, however; she simply offered the opinion that "it would be detrimental to disrupt [A.G.'s] attachment any further," an opinion based upon general information about the importance of stability and permanence for a child A.G.'s age that was vague and generic. It was equally applicable to virtually any young child that has been in foster care because of abuse or neglect.[6] Taking that opinion at face value, it is not evidence of a substantial risk of long-term emotional damage to A.G. It is simply generic evidence, with which nobody could quarrel, that a young child in foster care as a result of abuse or neglect is at higher risk of long-term attachment issues and other negative outcomes.

Further, to the extent the social worker's testimony could be construed as an opinion that if A.G. were transitioned to mother's custody she was

---

[6] In the 18-month report, she wrote that A.G.'s exposure to domestic violence and substance abuse in the home had "put[] her at a higher risk" for various negative outcomes running the gamut from "social, emotional and cognitive impairment" all the way up to "early death," and that "[t]he primary mental health concern for [A.G.] revolves around the [Adverse Childhood Experiences (ACEs)] research and the correlation between an anxious, disrupted, or insecure attachment and her success in future development, social skills and relationships. [A.G.'s] need for stable attachment and permanency is critical and urgent." At the hearing, she testified it was "a popular kind of accepted idea" that children under five are in their "foundational developmental years," and that A.G. had experienced "three years of kind of disruptive and insecure attachment, as well as exposure to significant trauma" based on domestic violence in the home. Therefore, she testified, "I think of her getting to a sense of family and belonging in the world is important so she can meet those next stages of developmental markers. [¶] Going to kindergarten; having that kind of stable, nurturing and safe home."

likely to suffer long-term, serious emotional damage that is uniquely distinct from the transitory but manageable grief experienced by any child in a successful foster care placement (cf. *Jasmon O., supra,* 8 Cal.4th at pp. 418-419), her opinion does not rise to the dignity of substantial evidence. The majority cites general principles about the importance of social workers in the dependency scheme, and I agree. But the cases the majority cites also recognize that their recommendations are not binding. (See *In re M.C.* (2011) 199 Cal.App.4th 784, 814–815; *In re Ashley M.* (2003) 114 Cal.App.4th 1, 10.) And none address whether or when a social worker's opinion constitutes substantial evidence. In my view, the juvenile court itself must give a social worker's opinion the evidentiary weight it deserves, judged by the standards applicable to all opinion evidence. "Expert opinions or the opinions of social workers are sufficient to sustain a detriment finding if they are "reasonably specific and objective" but not if they are based only on "mere subjective impressions, albeit professional subjective impressions." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th at pp. 1738, 1750; accord, *Georgeanne G., supra*, 53 Cal.App.5th at p. 867 [to constitute substantial evidence of detriment, social worker opinions "must be " 'based on *evidence* rather than an emotional response' "].) In this case, the social worker's opinion about A.G.'s emotional well-being was conclusory, largely unexplained and speculative. She was not qualified by the court as an expert in child development or mental health.[7] Her opinion was not based on any diagnosis of A.G., clinical evaluation or the input of any qualified mental health

---

[7] She was qualified as an expert in "social work" and "assessment of substance abuse issues." The former, in my view, adds nothing to the substantiality of her opinion beyond that of any other child welfare worker employed in the dependency system. That is her job.

professional.  And she herself was barely familiar with A.G., having personally only "lightly supervised approximately six to eight visits."  It is not substantial evidence of detriment, and the majority cites no authority to the contrary.  (See, e.g., *In re Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1346 [social worker's opinion regarding dirty drug tests did not support detriment finding where there was no clinical diagnosis of parental substance abuse problem]; *Blanca P., supra*, 45 Cal.App.4th at pp. 1751–1752  [social worker's opinion that was not based on any clinical evaluation of mother or testing to indicate mental illness, "is simply too vague to constitute substantial, credible evidence of detriment"].)

Furthermore, implicit in the social worker's opinion was the assumption A.G. would experience emotional damage that could neither be mitigated by reasonable measures to ease her transition from one household to another (such as a gradual transition plan or age-appropriate therapy) nor ameliorated over time by the enduring love and comfort of her own mother.  There was no evidentiary support for that unexplained assumption.  The social worker acknowledged that A.G. has a "loving relationship" with mother and described A.G. as "responsive" to mother who herself was "affectionate, attentive and engaging."  The court observed that mother "behave[s] appropriately and lovingly with [her] daughters and "you're a good mom in that regard."  The social worker's opinion of emotional detriment took no account of mother's capacity as a capable and loving parent to ease the emotional distress A.G. might experience if transitioned from her foster parents back to mother's custody.

In the end, it is all too easy for social workers, lawyers and judges to assess a person's fitness as a parent based on the struggles and mistakes that led to their child's removal in the first place.  That is particularly true in an

19

area as fraught as drug addiction. Lest the promise of family preservation become an empty one, juvenile courts must assess, in evaluating whether to return a child to parental custody, whether a parent who has availed themselves of reunification services poses a *current* safety risk to their child that is *substantial*. That assessment cannot rest on the fact of a parent's history of drug addiction alone or even on the fact that a parent has relapsed. It must take account of the extent and quality of the parent's progress toward maintaining sobriety, their present attitude and insight into their substance abuse, the context of any relapse during the reunification and their response after it occurs. Here, such an assessment was not undertaken, the evidence does not support a finding that mother currently poses a substantial danger to her child and writ relief is warranted.

I therefore dissent.

_____
Stewart, P.J.

Trial Court: Sonoma County Superior Court

Trial Judge: Hon. Dana B. Simonds

Counsel:

Windandsea Law Offices, Tracy M. De Soto, for Petitioner.

Sonoma County Counsel's Office; Gordon-Creed, Kelley, Holl, Angel and Sugarman, Jeremy Sugarman, and Anne H. Nguyen, for Real Party in Interest.

A165607, *Sarah K. v. Superior Court*

1